UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

– *against* –

ELVIN HUERTERO,

                    Defendant.

**OPINION & ORDER**

20 Cr. 580 (ER)

RAMOS, D.J.:

        Elvin Huertero was indicted for participating in a narcotics conspiracy in violation of 21

U.S.C. § 846, and for distributing and possessing with intent to distribute fentanyl, which

resulted in the death of the purchaser of the drugs, Eric Royce, in violation of 21 U.S.C. §§

841(a)(1) and (b)(1)(C).  He pleaded guilty to the latter of these charges, pursuant to a plea

agreement that allowed him to dispute that the use of the drugs he sold was the cause of Royce's

death.  A *Fatico* hearing was held on June 2, 2022 to determine whether the drugs sold by

Huertero were the but-for cause of Royce's death.  *See United States v. Fatico*, 603 F.2d 1053

(2d Cir. 1979).  For the reasons set forth below, the Court finds by a preponderance of evidence

that Huertero did sell the drugs to Royce, and that those drugs were the but-for cause of Royce's

death.

## I.        BACKGROUND

### a.  Facts Leading up to Royce's Death

        Eric Royce was found dead by his girlfriend at his apartment on East 34th Street in

Manhattan at around 2:30 pm on Sunday, December 1, 2019.  Doc. 39 at 3.  Royce was a

"chronic substance use[r]," Gov. Ex. 401 at 3, who had "developed a dependency on oxycodone"

in his 20s and had abused opioids since then.  Gov. Ex. 501 at 8.  He was last known to be alive

by his roommate sometime between midnight and 2:00 am.  At approximately 1:40 am, he was

captured on the surveillance camera in the lobby of his building when he left his building for a

matter of minutes, wearing the same yellow sweatshirt in which he was found dead, and

returning at approximately 1:43 am (though the government asserts that these timestamps may be

slightly inaccurate).  Doc. 47 ¶¶ 2–4 (citing Gov. Exs. 101–2); Gov. Ex. 401 at 25; Tr.[1] at 23:10–

16.  Royce's girlfriend had last communicated with him early that morning, at 12:30 am.  Gov.

Ex. 401 at 25.

Later that day, at around 12:30 pm, Royce's roommate went into the living room of their

apartment, but did not check on Royce.  *Id*.  At 2:30 pm, Royce's girlfriend came to the

apartment, entered his bedroom, and found his body cold and unresponsive, sitting down and

"slumped forward with his face toward the floor."  Doc. 39 at 4.  She called 911 and attempted to

move him to administer CPR, per the instructions of the 911 operator.  Gov. Ex. 401 at 25.  At

the *Fatico* hearing, the Government introduced Exhibit 104, a photograph that shows Royce

lying on the floor of his bedroom — he is on his side, with his face down, and is wearing the

yellow sweatshirt.  Another photograph, Government Exhibit 105, is a close-up of Royce's face.

His skin is purple, his lips are swollen and blue, and there is a yellow substance identified as

pulmonary edema coming out of his nose and mouth.

### b.  Police Investigation

Detective Anthony Mangano, the case detective assigned to Royce's death, testified that

when police inspected Royce's bedroom, they found several prescription medications and illegal

controlled substances.  Doc. 46 at 4–5; Gov. Exs. 106–13 (photos of Royce's prescription pill

bottles and of the drugs on his desk and in drawers).  These included a glassine bag containing

---

[1] Tr. refers to Doc. 44, the transcript of the *Fatico* hearing held on June 2, 2022.

small, tan rocks that were later determined to be the solid form of a combination of fentanyl, a synthetic opioid, Tr. at 93:14–18, and 6-monoacetylemorphine ("6-MAM"). Doc. 39 at 5; Gov. Ex. 302; Gov. Ex. 304. As the Court will discuss, the latter substance, 6-MAM, is most frequently found as a metabolite of heroin; that is, the body breaks down heroin into 6-MAM when the heroin is ingested. 6-MAM is then itself metabolized by the body into morphine. Most frequently, then, when a user dies from a heroin overdose, it is 6-MAM or morphine that is found in their bloodstream, since heroin degrades quickly. Tr. at 111:4. Here, however, one of the drugs found in Royce's room consisted of fentanyl combined with solid 6-MAM itself, not heroin, a combination which Detective Mangano testified that, in his experience, was exceedingly rare. In fact, he had seen the two drugs together "only in this case." Tr. at 39:12–17.

The police also found Loperamide, Alprazolam and Clonidine (all of which Royce had been prescribed), and a "plant-like material" believed to be marijuana in Royce's bedroom. Gov. Ex. 106; Tr. at 107:19. Other pills, not tested by police, were found in glassine bags and on the desk, as were traces of an unidentified, white powdery substance on a desk or bureau top and drug paraphernalia including a straw and lighter. Tr. at 108:17; Gov. Exs. 107–09.

Police also found Royce's cell phone in close proximity to his body. Tr. at 20:10. The phone had two phone numbers saved under the contact name "Joe Torillo," which together Royce had contacted 17 separate times between approximately 8:12pm on November 30, 2019 and 3:04 am on December 1, 2019 — eight times by phone and nine times by text. Tr. at 21:1–22:7; Doc. 39 at 4; Gov. Ex. 114. These phone numbers were later connected to defendant Huertero. Mangano first called one of the numbers more than two weeks after Royce's death, on December 17, 2019, to arrange a drug purchase. He "spoke to the person on the other line as the

3

victim, Eric Royce," and that person said that he would need to ensure that the person to whom he was speaking, ostensibly Royce, was not actually an undercover officer. Doc. 46 at 8; Tr. at 29:12–13; Doc. 39 at 4. A second call to Mangano occurred on December 20, 2019 at around 5:00 pm. At that time, it was Huertero who placed the call, calling Royce's number. Mangano was in possession of Royce's phone and answered, pretending to be Royce. Huertero asked him for a second time for assurance that he was not speaking to an undercover officer. Doc. 47 ¶ 22. Huertero also asked how the drugs he had sold Royce had "hit," which Mangano understood to mean how Royce had reacted to the drugs Huertero had sold him. Doc. 39 at 4. Mangano said that they had hit him hard, and Huertero responded that "we cut it up different since then," implying that he understood just how potent the drugs that he had sold to Royce were. Tr. at 34:22, 35:2–12; Doc. 47 ¶ 19.

Sometime before that second call on December 20, an undercover police officer, purporting to be a friend of Royce, called Huertero's phone to set up a drug purchase. Tr. at 31:2–5; Doc. 47 ¶ 18. She met with an individual who later identified himself as Huertero on December 20, 2019. Detective Mangano surveilled this meeting, which was also recorded by the undercover officer. Doc. 39 at 4. When the undercover met Huertero, Huertero again called Royce's phone, this time in her presence, to verify that she was "good;" that is, actually Royce's friend and not an undercover police officer. Gov. Ex. 103B at 1:13–15 (transcription of part of the taped encounter between the undercover officer and Huertero). After Mangano, still pretending to be Royce, vouched for the undercover officer, Huertero proceeded to sell narcotics to the officer. *Id.*; Doc. 39 at 4; Doc. 47 ¶¶ 25–26.

While the undercover officer was with Huertero, he twice told her only to consume a small about of the drugs, explicitly saying both "do not[] take a lot please" and "don't take a lot" —

again, intimating that he knew how powerful they were.  Doc. 47 ¶ 26; Tr. at 32:18; Gov. Ex. 103A at 3:7–8 (another transcription of part of the taped encounter between the undercover officer and Huertero); Gov. Ex. 103C at 2:2 (same).  The drugs Huertero sold to the undercover officer were analyzed and also found to consist of fentanyl and 6-MAM — the very combination of drugs found in Royce's bedroom — although they were in powder form.  Doc. 39 at 4–5; Tr. at 59:17–20; Doc. 46 at 8.

     **c.  Autopsy**

An autopsy of Mr. Royce was performed by Benjamin Criss, D.O., on December 2, 2019. Dr. Criss first performed an external examination, finding Royce to look "well-developed [and] well-nourished."  Gov. Ex. 401 at 4.  He examined the body for injuries, finding only a small abrasion on his left hand and a small contusion on his right hand.  *Id*. at 5.  Dr. Criss next examined Royce internally.  He described Royce's head, neck, cardiovascular system, respiratory system, lymphatic system, genitourinary system, endocrine system, and digestive system to be "unremarkable," *id*. at 5–6, and his musculoskeletal system to be "normal."  *Id*. at 6.

Dr. Criss submitted samples of Royce's blood, urine, and vitreous humor[2] for toxicologic testing.  *Id*.  As detailed in Dr. Criss's report, the following substances were found in Royce's femoral blood:

- 30 ng/mL of Fentanyl

- 1.6 ng/mL of Norfentanyl

- 0.10 ng/mL of 4-ANPP

- a detectable amount of B-hydroxyfentanyl

- 2.9 ng/mL of Clonazepam

---

[2] Vitreous humor is the organic, gel-like substance that is found in the eyeball.  Tr. at 134:12.

- 92 ng/mL of 7-aminoclonazepam

- 6.2 ng/mL of Alprazolam

- <50 ng/mL of Morphine

- <50 ng/mL of Oxymorphone

- 170 ng/mL of Oxycodone

- <50 ng/mL of Benzoylecgonine

- 3.8 ng/mL of THC

- 17 ng/mL of THC-COOH.

*Id*. at 7.  The following substances were found in his vitreous humor:

- <50 ng/mL of Morphine

- a detectable amount of 6-MAM

- <50 ng/mL of Oxymorphone

- 599 ng/mL of Oxycodone

- <50 ng/mL of Benzoylecgonine.

*Id*.  Notably, the toxicology screen revealed the presence of 6-MAM in the vitreous fluid and

fentanyl in the femoral blood.  Doc. 47 ¶ 35.

As relevant to this analysis, the final diagnoses of the autopsy were:

    I.  Acute and chronic substance use disorder with:
       A.  Acute intoxication by the combined effects of fentanyl, Heroin, Oxycodone, and Benzodiazepines
       B.  Pulmonary Edema

Gov. Ex. 401 at 3.  The cause of death was reported as "acute intoxication by the combined

effects of fentanyl, heroin, oxycodone, and benzodiazepines," and the manner of death was ruled

"accident (substance use)."  *Id*.

    **d.  Dr. Hail's Report and Testimony**

The government called Dr. Stacey Hail as an expert in medical toxicology.  Dr. Hail is an

emergency medicine physician and a medical toxicologist double board-certified by the

American Board of Emergency Medicine in the specialties of emergency medicine and medical

toxicology.  Gov. Ex. 501 at 1 (Dr. Hail's March 6, 2022 expert report as to Royce's cause of

death).  She is an attending physician in the Emergency Department of the Parkland Hospital —

a Level 1 Trauma Center with "the most emergency room visits of any single hospital in the

United States" — where she treats patients presenting with, *inter alia*, overdoses and toxic

exposures including illicit drugs.  *Id*.  She also works as a medical toxicologist at the North

Texas Poison Center, where she consults with physicians in North Texas regarding the

appropriate management of all types of overdoses, and is a professor at the University of Texas

Southwestern at Dallas.  *Id*.

Dr. Hail prepared a report to determine the "but-for" cause of Royce's death, in which

she describes the methodology she used to come to her conclusion.  *Id*. at 2.  First, she explained

how medical professionals use evidence of injuries to the body to rule out traumatic causes of

death and postmortem examination and medical history to rule out natural causes of death.  *Id*. at

3.  She also discussed arrhythmia, an electrical disturbance of the heart that can cause sudden

death but cannot be detected postmortem, and how this is often determined to be the cause of

death by ruling other potential causes by process of elimination.  *Id*. at 4.  She then discussed

how the "toxicological cause of death" can be determined.  *Id*.  First, she addressed the fact that

"cause of death [is] not determined by drug concentrations alone."  *Id*.  Rather, other

considerations such as the drug's potency and the perimortem circumstances[3] need to be

analyzed as well.  *Id*. at 5.  The substances found in the decedent's blood are analyzed in this

---

[3] Perimortem circumstances means the circumstances that were present around the time of death.  Tr. at 100:25–
101:1.

holistic way to determine which one was the but-for cause of death, though it is appropriate for a medical examiner to list all substances discovered postmortem in an autopsy report. *Id*. at 5. In other words, the medical examiner lists all of the substances without necessarily determining which, if any, was a "but-for" cause of death.

The report outlines seven recommendations Dr. Hail considers in cause of death determinations:

1. A complete autopsy is necessary for optimal interpretation of toxicology results, which must also be considered in the context of the circumstances surrounding death, medical history, and scene findings.
2. A complete scene investigation extends to reconciliation of prescription information and pill counts.
3. Blood, urine, and vitreous humor, when available, should be retained in all cases. Blood from the femoral vein is preferable to blood from other sites.
4. A toxicological panel should be comprehensive and include opioid and benzodiazepine analytes, as well as other potent depressant, stimulant, and anti-depressant medications.
5. Interpretation of postmortem opioid concentrations requires correlation with medical history, scene investigation, and autopsy findings.
6. If death is attributed to any drug or combination drugs (whether as cause or contributing factor), the certifier should list all the responsible substances by generic name in the autopsy report and on the death certificate
7. The best classification for manner of death in deaths due to the misuse or abuse of opioids without any apparent intent of self-harm is "accident." Reserve "undetermined" as the manner for the rare cases in which evidence exists to support more than one possible determination.

*Id*. at 6.

Dr. Hail's report next discussed the use and importance of "toxidromes" to her analysis. Toxidromes are the "constellation of signs and symptoms for a given toxin or drug" that are exhibited when one overdoses on it. *Id*. at 6. In other words, toxidromes describe the differences that can be observed between an individual who overdoses from opioids—such as fentanyl or heroin—and stimulants—such as cocaine. She discussed two toxidromes: the opioid

and the sympathomimetic.[4]  The opioid toxidrome presents with pinpoint pupils, central nervous system depression, and respiratory depression,[5] and death occurs by the patient falling unconscious, whereupon they eventually stop breathing and die.  *Id*.  Fentanyl is one of the opioids that causes this toxidrome and is much stronger than other opioids—Dr. Hail testified that fentanyl is 50 to 100 times stronger than both oxycodone and heroin.  *Id*. at 6–7; Tr. at 94:15–20.  The sympathomimetic toxidrome is associated with "stimulants such as methamphetamine or cocaine" and causes symptoms like "euphoria, excitability, agitation, hyperreflexia, dizziness and hypervigilance," increased heart rate and high blood pressure, as well as "neurological excitation," delusions and paranoia, and a "post-binge crash."  Gov. Ex. 501 at 7.  It can cause cardiac arrhythmias.  *Id*.

Dr. Hail then discussed Royce specifically.  She discussed his age and his lack of known medical conditions.  She noted that he had first been prescribed opioids after a car accident and his subsequent "on and off" opioid usage, *id*. at 7–8, the medicine and other drugs that were found in his bedroom, *id*. at 9–10, and the autopsy and other reports produced by the police.  *Id*. at 11–12.  She also discussed the events leading up to his death and following when he was found.  *Id*. at 8.  She first ruled out natural and traumatic causes of death, since there was a lack of external and internal evidence of either of these occurring.  *Id*. at 12–13.  She then analyzed each of the substances found in Royce's blood and their metabolites, specifically, Alprazolam/Clonazepam/7-aminoclonazepam, Benzoylecgonine, THC/THC-COOH,

---

[4] In her report, Dr. Hail only discussed these two toxidromes.  In her oral testimony, she also discussed a third, the sedative hypnotic toxidrome.  Tr. at 103:25–104:10.

[5] According to Dr. Hail, respiratory depression is when a patient "breathe[s] slower and slower and shallower and shallower until [they] stop breathing and die."  Tr. at 102:2–4.

Fentanyl/Norfentanyl/4-ANPP/β-hydroxyfentanyl, morphine/6-MAM, and oxycodone/oxymorphone.

   She ruled out the Alprazolam and Clonazepam as but-for causes of death because they do not cause respiratory depression themselves and she had "never seen [a] patient[] stop breathing and die in a benzodiazepine-alone overdose." *Id*. at 13.  She ruled out benzoylecgonine, a metabolite of cocaine, because there was "no evidence in this case that [Royce] was agitated or manifesting the signs and symptoms of the sympathomimetic toxidrome," *id*., and no cocaine in its active form was found in his blood. *Id*. at 14.  She ruled out cannabinoids because they do not cause respiratory depression. *Id*.  She ruled out the oxycodone because there was "no evidence that there was a massive ingestion of oxycodone; and given its low potency relative to fentanyl," it was therefore unlikely to have caused the death on its own. *Id*. at 15.  She found that the 6-MAM is often not "present in detectable quantities," as here, when death is a result of a heroin overdose. *Id*. at 14.

   Lastly, Dr. Hail discussed the fentanyl found in Royce's blood.  Her report states that fentanyl has a "high potency" and "causes the opioid toxidrome . . . respiratory depression, and . . . pulmonary edema." *Id*.  She found that Royce had all three, and that he "was found in a slumped over position," which suggests respiratory depression resulting in unconsciousness, and there was the presence of pulmonary edema, all of which is consistent with fentanyl toxicity. *Id*. She also emphasized the rock that was discovered on the scene that contained fentanyl.  Based on all of the foregoing, Dr. Hail concluded that Royce's "death was due to opioid toxicity due to the fentanyl/6-MAM rock that was present at the scene," and that this combined drug was the but-for cause of his death. *Id*. at 15.  She further stated that "[d]eath was unlikely to be due to oxycodone itself, benzodiazepines themselves, or a combination of both." *Id*.

Dr. Hail's testimony largely tracked her expert report, but she also provided additional analysis.  First, she reiterated that her ultimate conclusion was made using a combination of factors, including the autopsy report, death certificate, medical history, photos, toxicology report, and perimortem circumstances and toxidrome analysis.  Tr. at 98:16–101:5.  Second, since the toxicology report had been performed postmortem but before the lab report identified the fentanyl/6-MAM rock not to be heroin, Gov. Ex. 401 at 7; Doc. 47 ¶ 38, Royce's cause of death was initially listed in the autopsy as "acute intoxication by the combined effects of fentanyl, heroin, oxycodone, and benzodiazepines."  Gov. Ex. 401 at 3.  Dr. Hail, though, clarified this finding in three ways:  first, she reiterated that the inclusion of all of the other drugs in the autopsy report was out of an abundance of caution and was "intellectually honest", and that the drugs other than fentanyl either did not contribute to his death at all, or contributed, but were not a "but-for cause of death."  Gov. Ex. 501 at 5; Tr. at 117:7–19.  Second, she stated that because of the 6-MAM in Royce's system, "[t]he fact that there was heroin present would have been my conclusion if I was reviewing this case in a vacuum without any investigative materials;" however, she concluded that the 6-MAM itself was what Royce ingested in this case, and was not present in his system merely as a metabolite of heroin.  Tr. at 121:3–6.  This was based on the lab report identifying the rock found in Royce's bedroom as consisting of fentanyl and 6-MAM, and that no substances found in his room were identified as heroin.  Doc. 47 ¶ 37.  Third, she reiterated, consistent with her report, that even though there was a lower concentration of fentanyl in Royce's blood than some of the other drugs, "there are no defined 'lethal' levels for drugs," and "interpretation of concentrations measured in post-mortem samples [is] difficult or impossible" because "how the effects [of a drug] are related to the measured concentration" is not always known.  Gov. Ex. 501 at 4–5; Tr. at 149:7–20.  This is especially important to

11

consider when one drug out of those ingested is much more potent than the others, as is the case with fentanyl here.  Tr. at 94:15–20.

After discussing her toxidrome analysis, Tr. at 101:8–107:14 (his symptoms were "consistent . . . [w]ith the opioid toxidrome"), Dr. Hail discussed the other pills that were found in Royce's room and the fentanyl/6-MAM rock.  *Id*. at 108:8–111:11.  She again analyzed each substance found in Royce's room and blood and why none but the fentanyl was the but-for cause of death.  *Id*. at 111:18–117:19.  At cross, Dr. Hail further clarified that, although there is no way to tell the difference between 6-MAM that is ingested as such and 6-MAM that is a metabolite of heroin, it is "highly unlikely in this case" that Royce had overdosed on heroin, because of the perimortem circumstances surrounding his death—i.e. that he was slumped over, which is consistent with a fentanyl overdose, not a heroin overdose, because the loss of consciousness is so much speedier with fentanyl than heroin, and that fentanyl was found nearby in his bedroom. *Id*. at 138:23–139:11; 106:14–16; 124:2–125:22.  Indeed, as the government recognizes, "[m]any individuals who die of fentanyl overdoses are found slumped or otherwise unusually positioned." Doc. 47 ¶ 31.  At redirect, she stated that this was "not a close call.  [Fentanyl] is the obvious but-for cause of death."  *Id*. at 149:1–2.

### e.  Mr. Petersohn's Testimony

The Government called professional engineer Andrew Petersohn as an expert witness in cell site data.  Petersohn runes DbM Engineering, which provides network engineering and electromagnetic emissions reports to Verizon Wireless, AT&T, T-Mobile, and Dish Network, among other wireless providers.  Tr. at 65:2–11.  Petersohn provided cell site analysis concerning the use of Huertero's phones.  In brief, he analyzed the cellular towers, or cell sites, to which Royce's phone and Huertero's two phones connected throughout the night on which

12

Royce died.  *Id*. at 68:14.  In New York City, he testified, cell phones usually connect to a cell site "within a few blocks" of where the phone is located when they are used.  *Id*. at 72:9.  Using a PowerPoint slideshow with images displaying the cell sites near Royce's apartment, Petersohn testified that on the night of November 30 and December 1, 2019, Huertero's two phones had connected to cell sites in Washington Heights, in upper Manhattan, throughout the night, except for a period around 2:00 am, around the time surveillance footage caught Royce leaving his apartment, when they connected to cell sites less than a city block from Royce's apartment on East 34th Street—Huertero's phones made calls at 2:00 am and 2:06 am that connected to those cell sites.  Doc. 39 at 4; Tr. at 75–76; Gov. Ex. 205 at 4–7; Doc. 47 ¶ 13.  Huertero's phones were picked up in Washington Heights both before and after that period — they connected to cell sites in Washington Heights when they made calls at 1:24 and 1:46 am, and at 2:43 and 2:44 am. Gov. Ex. 205.

### f.   Procedural History

Huertero was indicted on October 27, 2020, on two counts:  Count One charged him with participating in a narcotics conspiracy from December 2019 until September 2020 in violation of 21 U.S.C. § 846; Count Two charges that he distributed or possessed with intent to distribute fentanyl around December 1, 2019, the use of which caused the death of Eric Royce, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C).  Doc. 39 at 1.  He was arrested on December 29, 2020, and pleaded guilty to the second count pursuant to a plea agreement on April 29, 2022.  *Id*.  The agreement allowed him to dispute that he sold to Royce the drugs that caused Royce's death.  *Id*. A *Fatico* hearing was held to determine the "death-resulting" issue, although Huertero also put the government to its proof to show that he in fact sold the drugs to Royce.  Doc. 39 at 1 n.1; Tr. at 5:18–19.

## II.    DISCUSSION

### a.  Legal Standard

In sentencing proceedings, "a district court should begin . . . by correctly calculating the applicable [United States Sentencing Guidelines ("U.S.S.G.")] range."  *Gall v. United States*, 552 U.S. 38, 49 (2007) (internal citations omitted).  However, the range provided by the U.S.S.G. is only advisory.  *See United States v. Booker*, 543 U.S. 220, 245 (2005).  The Court "may not presume that the Guidelines range is reasonable" for the facts and circumstances in every case.  *Gall*, 552 U.S. at 50 (internal citations omitted).  Rather, the Court must assess and consider, among other things, "the history and characteristics of the defendant."  18 U.S.C. § 3553(a)(1).

To this end, sentencing courts are permitted "to consider the widest possible breadth of information about a defendant [to] 'ensure[] that the punishment will suit not merely the offense but the individual defendant.'"  *Pepper v. United States*, 562 U.S. 476, 488 (2011) (quoting *Wasman v. United States*, 468 U.S. 559, 564 (1984)); *see also United States v. Broxmeyer*, 708 F.3d 132, 135 (2d Cir. 2013).  This inquiry is "largely unlimited . . . as to the kind of information . . . consider[ed], or the source from which it may come."  *Witte v. United States*, 515 U.S. 389, 398 (1995) (internal citations and quotation marks omitted).  Indeed, the Court "may consider[, for example,] hearsay statements, evidence of uncharged crimes, dropped counts of an indictment[,] and criminal activity resulting in an acquittal in determining sentence."  *United States v. Romano*, 825 F.2d 725, 728 (2d Cir. 1987) (citing *United States v. Pugliese*, 805 F.2d 1117, 1122 (2d Cir. 1986)).  "No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a

court of the United States may receive and consider for the purpose of imposing an appropriate sentence." 18 U.S.C. § 3661.

Any conduct considered must be proven by a preponderance of the evidence. *See Witte*, 515 U.S. at 401; *see also United States v. Garcia*, 413 F.3d 201, 220 n.15 (2d Cir. 2005); *United States v. Ruggiero*, 100 F.3d 284, 290 (2d Cir. 1996) ("the Second Circuit has held repeatedly that 'disputed facts relevant to sentencing, even under the Guidelines, need be established only by a preponderance of the evidence.'") (quoting *United States v. Concepcion*, 983 F.2d 369, 388 (2d Cir. 1992), *cert. denied*, 510 U.S. 856 (1993)).  In this Circuit, courts may conduct this inquiry by way of a *Fatico* hearing, during which "the prosecution and the defense may introduce evidence relating to the appropriate sentence." *United States v. Lohan*, 945 F.2d 1214, 1216 (2d Cir. 1991) (citing *Fatico*, 603 F.2d at 1053).

As for the indictment at issue, "[t]he Controlled Substances Act imposes a 20-year mandatory minimum sentence on a defendant who unlawfully distributes a Schedule I or II drug, when 'death or serious bodily injury results from the use of such substance.'" *Burrage v. United States*, 571 U.S. 204, 206 (2014) (quoting 21 U.S.C. § 841(a)(1), (b)(1)(A)–(C) (2012 ed.)). Since the Act does not define the term "results from," "we give it its ordinary meaning[:]  . . . [r]esults from imposes . . . a requirement of actual causality . . . this requires proof that the harm would not have occurred in the absence of — that is, but for—the defendant's conduct." *Id*. at 210–11 (quoting *University of Tex. Southwestern Medical Center v. Nassar*, 570 U.S. 338, 346–47 (quoting Restatement of Torts § 431, Comment *a* (1934))) (internal quotation marks omitted). Therefore, "at least where use of the drug distributed by the defendant is not an independently sufficient cause of the victim's death or serious bodily injury, a defendant cannot be liable under the penalty enhancement provision of 21 U.S.C. § 841(b)(1)(C) unless such use is a but-for cause

of the death or injury." *Id*. at 218–19.  Accordingly, this but-for causation must be proven by the prosecution by a preponderance of the evidence.

### b.  Analysis

#### i.  Huertero Sold Royce the Drugs in Question

It was the prosecution's duty to prove by a preponderance of the evidence that (1) Huertero sold the drugs to Royce that night, and (2) these drugs were the but-for cause of his death.  It did so successfully.

First, Detective Mangano testified that Royce's phone was in communication with Huertero's phones 17 times the night that Royce died.  More specifically, Petersohn's testimony established that Huertero's phone was present in Royce's neighborhood during the brief window of time that Royce left his apartment building that morning.  Petersohn testified that Huertero's two phones were connected to cells sites within "about 200 feet or so" of Royce's apartment between 2:00 AM and 2:06 AM, Tr. at 76:4–15; Doc. 46 at 9.  Although this cell-site information could not pinpoint the phones' precise location, he testified that the ubiquity of cell sites in that area meant that "the device[s were] likely in the area" near to the cell sites to which it connected.  Tr. at 75:19.  Further, while the timestamps on the lobby surveillance camera that recorded Royce leaving his apartment placed his departure at 1:43 am, around 17 minutes earlier than the telephone call records, which were at 2:00 am, Detective Mangano testified that "it is not uncommon and that it is the case that these surveillance stamps can be off."  Tr. at 155:25–156:1.  Indeed, it logical to conclude that Huertero was in Washington Heights, traveled to Royce's neighborhood in the east side of midtown Manhattan, met Royce outside of his apartment to deliver the drugs, and returned to Washington Heights.

The government bolsters this inference with further evidence about the chemical composition of the drugs that were found in Royce's apartment and blood and those drugs that Huertero sold the undercover police officer.  First, as discussed above, a bag of a tan, rock-like substance was thereafter found in a drawer in Royce's bedroom.  Tr. at 19:1.  When those drugs were tested, they were found to consist of fentanyl and 6-MAM.  *Id*. at 39:2.  Detective Mangano testified that he had never previously encountered drugs in that combination.  Second, the autopsy revealed that both fentanyl and 6-MAM were found in Royce's blood after he died.  *Id*. at 111:25–113:1.  Lastly, several weeks later, Huertero sold drugs consisting of the same two substances to the undercover police officer.  Doc. 39 at 4–5.  Two witnesses, one an experienced narcotics detective and the other a board-certified toxicologist, both testified to the fact that a drug with this combination of ingredients is exceedingly uncommon.  Mangano testified that he had never before seen the combination, and Dr. Hail had never seen 6-MAM in a solid, non-metabolic form at all.  Tr. at 39:12–17; 111:11.  Further, Detective Mangano testified that Huertero asked him on the phone (while he was imitating Royce) how those drugs "had hit."  Tr. at 34:21.  That Huertero explicitly inquired into the potency of the drugs Royce had taken *while* Huertero was in the process of selling drugs that turned out to have the same chemical composition to the undercover police officer is strong evidence that he sold the same type of drugs to Royce, too.  Doc. 47 ¶ 27.

Put simply, given the similarities between the drugs found in Royce's apartment and in his blood to those Huertero sold to the undercover police officer, the fact that Huertero asked Royce about the potency of the drugs, and the alignment between the time at which Royce left his apartment and the time at which Huertero's cell phone connected to cell sites near that

apartment, the government has shown that it was more likely than not that it was Huertero who

sold Royce the drugs he ingested that day.

Huertero suggested multiple reasons during the *Fatico* hearing as to why this evidence

did not establish that Huertero's drugs were not the but-for cause of Royce's death. [6]  None are

persuasive.  *See generally United States v. Persico*, 266 F. Supp. 3d 632, 644–5 (E.D.N.Y. 2017)

(finding a defendant's arguments raised at a *Fatico* hearing as to why he was not implicated in an

organized criminal scheme too attenuated to overcome the preponderance of evidence standard).

First, since no camera footage existed that recorded the outside of the building, he suggested "[i]t

was possible that Royce went outside to smoke a cigarette."  Doc. 46 at 6; Tr. at 55:23.  While

this is may be a reasonable suggestion, it is not enough in the face of stronger evidence to the

contrary; namely, that Huertero had traveled miles from Washington Heights to the vicinity of

Royce's apartment for just a few minutes, close to the same time at which Royce went outside

only after numerous telephone contacts with Royce to complete a drug transaction.

Huertero further suggests that Royce could have "bought [additional] drugs the day

before," Tr. at 57:12–13, or from one of his other dealers.  He contends that Royce's girlfriend

told the police that Royce's "primary drug dealer had been a man named . . . 'Jay'," who lived

closer to his apartment.  Doc. 46 at 6–7.  However, Detective Mangano testified that, as part of

his investigation into Royce's death, the police had also investigated and purchased drugs while

undercover from Jay.  Tr. at 49:7–50:17.  After Royce's death, the police purchased oxycodone

pills multiple times from Jay and his romantic partner, Erica.  Doc. 47 ¶ 15.  The drugs that the

police bought from Jay were pure oxycodone and tested negative for fentanyl and 6-MAM

---

[6] While Huertero argued at the *Fatico* hearing that he did not sell any fentanyl to Royce that night, he has withdrawn that argument.  Doc. 47 ¶ 51 n.9 (citing Doc. 46 at 17 n.2).  He now asks the Court to review the record to find that the government did not meet its burden in proving that this transaction took place.  Doc. 46 at 17 n.2.

completely.  Doc. 46 at 7; Doc. 47 ¶¶ 16–17.  While Royce theoretically could have bought additional drugs the day before or from a different dealer, the government demonstrated that a drug dealer known to traffic in the precise combination of drugs found in Royce's blood and bedroom traveled to his vicinity soon before he overdosed.  Moreover, Huertero then sold this exceedingly rare drug approximately three weeks later to an undercover officer.  In sum, the government presented compelling evidence that it was Huertero who sold Royce the drugs in the early morning of December 1, 2019, not some other dealer or at some other time.

### ii.  The Drugs Sold to Royce by Huertero Were the But-For Cause of Royce's Death

#### 1.  Toxicology Analysis

Having demonstrated that it was more likely than not that Huertero sold Royce the drugs in question, the government also successfully demonstrated by a preponderance of the evidence that those drugs were the but-for cause of Royce's death.  The testimony of Dr. Hail was instructive as to the roles that the various substances found in Royce's body played in his death. She stated multiple times that this was "not a close call," and that the fentanyl Huertero sold Royce was "the obvious but-for cause of death."  Tr. at 149:1–2.

Dr. Hail testified that she reached this conclusion for a number of reasons.  First, she discussed the relative potency of fentanyl.  She clarified that fentanyl was 50 to 100 times more potent than both Oxycodone and heroin.  *Id*. at 94:15–20.  Dr. Hail suggested that, even though other substances were present in Royce's blood and vitreous (the gel-like substance in the eye that is sometimes tested for the presence of drugs postmortem), this relative strength made it more likely that the fentanyl had caused his death, rather than any of these other drugs.  As she explained, "if the fentanyl is a shotgun wound to the heart and the heart is blown open and then

there is a BB gun wound," the latter "would contribute[] but [is] not a but-for cause of death." *Id*. at 116:15–18.

Dr. Hail analyzed all of the substances present in Royce's blood when he died, and ruled out drugs other than the fentanyl as his cause of death.  First, she ruled out the benzodiazepines (i.e., the Loperamide, Alprazolam and Clonidine) in Royce's system.  Benzodiazepines, she testified, are weaker drugs, and are comparatively much weaker in the "respiratory depression" (i.e. slowed, shallow breathing) they cause.  *Id*. at 116:11.  Further, she stated that it is only when there is an opioid present that benzodiazepines cause significant respiratory depression, meaning that they alone could not have been the but-for cause of Royce's death.  *Id*. at 116:13–14. Tellingly, she testified that none of the multitude of patients she had treated for overdosing on large amounts of benzodiazepines had ever died.  *Id*. at 112:20–24.

Second, though both the oxymorphone and oxycodone (the other opioids in his blood) would cause death in a similar manner to fentanyl, that they were much less potent signified to her that they were not the cause of death.  Indeed, when the Court asked Dr. Hail how this could be the case even though there had been more nanograms per milliliter of oxycodone in Royce's system than of fentanyl, she affirmed that "analysis should not depend on those numbers," and that concentrations "cannot [be] interpret[ed] in a vacuum;" rather, a drug's potency and the victim's perimortem circumstances must be considered, too.  *Id*. at 148:8–9, 100:21–101:1.  And, especially since Royce had a tolerance for opioid use, these drugs would have "contribut[ed] to" the death but would not have caused the death on their own.  *Id*. at 117:9.  Dr. Hail also found that the cocaine metabolite and THC, a cannabinoid from marijuana, had no effect on Royce's death.  *Id*. at 116:20–25.  This was because such small amounts were found, there was no cocaine found at the scene, and because the perimortem circumstances including the way in

20

which his body was found did not demonstrate their excessive use.  *Id*. at 144:15–23.  Lastly, Dr. Hail opined that Royce had not consumed heroin at all, even though the initial autopsy had stated that he did, again, because the evidence suggested that the 6-MAM found in his blood resulted from direct consumption, and was not present as a mere metabolite of heroin.  *Id*. at 121:3–6.

Dr. Hail discussed substance by substance how Royce's body was impacted by the drugs found in his system.  And in doing so, she demonstrated why the other drugs were not sufficiently powerful to cause his death—either because of his prior use or their absolute and relative chemical potencies.  This testimony established that it was more likely than not that it was the fentanyl that was the but-for cause of Royce's death, as it suggests that without it, he would not have died.

### 2.  Toxidrome Analysis

Dr. Hail further discussed the way in which a user who overdoses on each of these types of drugs actually dies, a set of symptoms called a "toxidrome"—the combination of the words "toxic" and "syndrome" that signifies the "signs and symptoms that are unique to a substance or group of substances."  *Id*. at 101:8–10.  She demonstrated that Royce's death was consistent with the opioid toxidrome, rather than the toxidromes exhibited by the other drugs in Royce's system.

In addition to the opioid toxidrome, she analyzed two toxidromes that were potentially relevant to Royce's death:  the sympathomimetic toxidrome and the sedative hypnotic toxidrome.  The sympathomimetic toxidrome is caused by stimulants like cocaine, and involves dilated pupils, "agitation and psychosis," "superhuman strength," and "seizures and arrhythmias."  *Id*. at 103:18–104:10; 105:10.  The sedative hypnotic toxidrome, which can be caused by the alcohol and benzodiazepines found in Royce's system, causes a user to be "very sedate, but [does] not cause respiratory depression."  *Id*. at 104:9–10.  The opioid toxidrome

"consists of pinpoint pupils, central nervous system depression . . . [and] respiratory depression . . . [which is] where you breathe slower and slower and shallower and shallower until you stop breathing and die." *Id*. at 101:22–102:4.

The former two were unlike the symptoms Royce displayed. With regards to the sympathomimetic toxidrome, Royce did not have a reported seizure or arrhythmia. He did not have dilated pupils, and he was not agitated. Indeed, Royce was found "in a sitting position on his bedroom floor with his legs crossed [and] slumped forward with his face toward the floor." *Id*. at 106:6–8. Dr. Hail testified that this lethargy suggests a "rapid loss of consciousness" that is extremely dissimilar to the type of agitation found in the sympathomimetic toxidrome, but instead was "very frequently found" in those who overdosed on fentanyl. *Id*. at 106:20.

While symptoms of the sedative hypnotic toxidrome at first glance seem similar to the opioid toxidrome, they can be distinguished, since this toxidrome "does not usually involve respiratory depression to the same extent as opioids." Doc. 46 at 11; Tr. at 137:24–138:2. The pulmonary edema (lung fluid) that had come out of Royce's nose, Dr. Hail testified, was a result of respiratory depression, since it is caused by the airway collapsing in on itself. Tr. at 102:8–10. So while Royce was obviously quite sedate when he died, the sedative hypnotic toxidrome is also inapposite, since benzodiazepines "do not cause [this] significant respiratory depression in and of themselves." *Id*. at 104:17–18.

By contrast, Royce's "death [and perimortem symptoms were] consistent with the opioid toxidrome." Doc. 47 ¶ 34. Most obviously, the pulmonary edema demonstrates that he experienced respiratory depression. That he died "slumping over because of rapid loss of consciousness and [was] found in [an] unusual position . . . is more consistent with an opioid

death" than the other toxidromes, too.[7]  Tr. at 105:2–5.  The blood pooled in Royce's face, called

lividity, demonstrates that he had been in this face-down position for some time.  *Id*. at 107:4–7.

Dr. Hail thus demonstrated by at least a preponderance of the evidence that Royce's

death was most similar to that of someone who had overdosed on opioids, as opposed to the

other drugs that were in his system at the time.  Within this group, fentanyl was by far the

strongest opioid in Royce's system and the others were much less likely to cause death on their

own.  Dr. Hail stated that among the three opioids found in Royce's blood, (oxycodone, 6-MAM,

and fentanyl), "fentanyl is by far the most potent, and the body was in a position where there was

a rapid loss of consciousness, which is consistent with fentanyl, not the other two opioids."  *Id*. at

145:20–22.  Considering, too that there was no evidence of "a massive ingestion of oxycodone,"

which is the only situation in which "[o]xycodone can cause death by itself," fentanyl is the most

likely cause of death.  *Id*. at 145:23–146:3.  Furthermore, Dr. Hail explicitly stated that even if

the oxycodone had contributed to the death, this was not "inconsistent in any way with" fentanyl

being the but-for cause of death.  *Id*. at 148:16–17.  And especially since the fentanyl was so

much more powerful, regardless of if this oxycodone contributed, the government successfully

proved that the fentanyl was the "straw that broke the camel's back" — in other words, that it

was alone the but-for cause.  Doc. 47 ¶ 50 (quoting *Burrage*, 571 U.S. at 211).  Without its

incremental effect, Royce would have lived.  *Id*.  This testimony therefore demonstrates that it

was overall more likely than not that the fentanyl specifically caused Royce's death.  And since

---

[7] Though Huertero is correct that Dr. Hail "cited no peer reviewed articles . . . in support of her conclusion" that
Royce's position when he died was "very significant," Doc. 46 at 11 (quoting Tr. at 106:1–24), the court finds that
her opinion is sufficiently supported by her testimony that she has "treated so many overdose patients that they are
'too numerous to count,'" Doc. 46 at 10 (quoting Tr. at 89:2–90:11) and has seen firsthand the differences in
perimortem circumstances between those who overdose on Fentanyl versus other opioids.

"the evidence shows that fentanyl was used and was present at the scene . . . that rock that contained those substances . . . is the but-for cause of death."  Tr. at 146:20–24.

Lastly, Dr. Hail testified as to the substances found in Royce's room.  First, she suggested that the fact that the rock of fentanyl/6-MAM was found in the room was strong evidence that it was the but-for cause of death.  Second, she testified that no other substance on the scene tested positive for fentanyl.

### 3.  Huertero's Defenses

Huertero raises a number of arguments calling into question the conclusion that it was the fentanyl that he sold Royce that caused Royce's death.  But none is enough to overcome the government's proof.  First, Huertero points out that it is "possible that [Royce] might have ingested a . . . pill that was not found in the apartment," or that he took some other fentanyl-based drug not sold to him by Huertero instead, such that there was no evidence of that drug in his apartment.  *Id*. at 122:8–9.  He also argues that Royce could have just overdosed on heroin in its original form, and that the 6-MAM seen in his blood was a byproduct of that ingestion, *id*. at 125:14–17, or overdosed on the Xanax prescribed to him.[8]  Huertero also claims that Royce may have "consumed a fatal dose of oxycodone" either immediately before or at the same time as the fentanyl, and therefore that it is "quite possible here" that he died from that instead.  Doc. 46 at 2; Tr. at 160:4–6.  While these are technically plausible counter-explanations, they are unconvincing in the face of overwhelming evidence to the contrary.  The government's timeline, buttressed by the phone records and the building surveillance footage, compel the conclusion that Huertero and Royce engaged in a drug transaction the night that Royce died.  Similarly compelling is the fact that Huertero was the source of a rare combination of drugs provided to an

---

[8] Huertero admits that "Xanax overdoses . . . are rare," so this explanation also does not rebut the much more plausible explanation the government proposes.  Doc. 46 at 13 (quoting Tr. at 130:4–6).

undercover officer that matched drugs that were found in Royce's room.  The drugs found in

Royce's system were also consistent with that combination.  Moreover, Dr. Hail explained that

fentanyl was notably more potent than any of the other opioids found in Royce's blood.  She

made evident that it is not the nanogram-per-milliliter *amount* present in the blood that

determines a drug's impact on death, but that the drug's potency and the perimortem

circumstances must also be considered in determining which drug was the but-for cause of death.

### III.    CONCLUSION

For the foregoing reasons, the Court finds that the government has proven by at least a

preponderance of the evidence that Huertero sold Royce the drugs that he ingested on December

1, 2019, and that those drugs were the but-for cause of Royce's death.


It is SO ORDERED.


Dated:    July 13, 2022
         New York, New York

_____
        EDGARDO RAMOS, U.S.D.J.